**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| MOBILITY WORKX, LLC,<br><br>     Plaintiff,<br><br>v.<br><br><br> T-MOBILE US, INC.,<br> T-MOBILE USA, INC.<br>  F/K/A METROPCS<br>    COMMUNICATIONS, INC. and<br>   F/K/A METROPCS WIRELESS, INC.,<br> and<br>METROPCS TEXAS LLC,<br><br>     Defendants. | Civil Action No. 4:17-cv-00567-ALM<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

TABLE OF EXHIBITS ............................................................................................... v

I.      INTRODUCTION ............................................................................................ 1

II.     TECHNOLOGY BACKGROUND ................................................................. 1

        A.      IP Routing and Mobile IPv4 .............................................................. 2

        B.      Conventional Digital Cellular Networks ........................................... 3

III.    APPLICABLE LEGAL PRINCIPLES ......................................................... 4

IV.     DISPUTED CLAIM TERMS ......................................................................... 4

        A.      "ghost mobile node" (508: cls. 1 and 2; 417; cls. 1, 4, and 7) ......... 5

        B.      "foreign agent" (508: cls. 1 and 5; 417: cls. 1, 4, and 7) ............... 12

        C.      "ghost-foreign agent" (508: cls. 1 and 5; 417: cls. 1) .................... 15

        D.      "geographical current state" (508: cl. 1) ....................................... 16

        E.      "predicted geographical future state(s)" (508, cl. 1) ..................... 18

        F.      "at least one foreign agent identified for each of the geographical future states" (508: cl. 1) ............................................................................................................ 20

        G.      "while the mobile node remains in the geographical current state" (508: cl. 1) ........... 21

        H.      "when the mobile node is located in a geographical area where foreign agent is not physically present" (417: cl. 1) ....................................................................... 22

        I.      "a ghost-mobile node that creates replica IP messages on behalf of a mobile node" (417: cl. 1) ............................................................................................................. 22

        J.      "updating, in a mobile node, a location in a ghost mobile node" (417: cl. 7) ............. 25

        K.      "submitting on behalf of the mobile node, from the ghost mobile node, a registration to the foreign agent to which the mobile node is going to complete the handover" (417: cl. 7) 26

        L.      "upon completing the handover, updating a registration in the mobile node" (417: cl. 7) ............................................................................................................. 27

M.    "means for registering said ghost mobile node or mobile node with the associated ghost foreign agent or foreign agent, while the mobile node remains in the geographical current state" (508: cl. 1) ................................................................................... 27

N.    "means for linking the mobile node with a foreign agent associated with said ghost foreign agent when the mobile node enters a respective geographical future state associated with said foreign agent" (508: cl. 1) ................................................................. 29

V.    CONCLUSION ................................................................................................................ 30

CERTIFICATE OF SERVICE ....................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atofina v. Great Lakes Chem. Corp.*,
    441 F.3d 991 (Fed. Cir. 2006)..................................................................................10

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004)............................................................................26, 27

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006)..................................................................................23

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999)....................................................................................27

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012)..................................................................................28

*Media Rights Tech.'s, Inc. v. Capital One Fin. Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015)..................................................................................29

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)................................................................................................25

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)..................................................................................30

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003)..................................................................................25

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..................................................................................22

*On-Line Tech. v. Bodenseewerk Perkin-Elmer*,
    386 F.3d 1133 (Fed. Cir. 2004)..................................................................................18

*SafeTCare Mfg., Inc. v. Tele-Made, Inc.*,
    497 F.3d 1262 (Fed. Cir. 2007)....................................................................................7

*SRAM Corp. v. AD-II Eng'g, Inc.*,
    465 F.3d 1351 (Fed. Cir. 2006)..................................................................................23

*TQP Development, LLC v. Intuit Inc.*,
    No. 2:12-cv-180-WCB, 2014 WL 2810016 (E.D. Tex. Jun. 20, 2014)....................21

*VStream Techs., LLC v. PLR Holdings, LLC*,
    No. 6:15-cv-974, 2016 WL 5387777 (E.D. Tex. Sept. 27, 2016).............................7

STATUTES

35 U.S.C. § 112(6) ..............................................................................................................28, 29

## TABLE OF EXHIBITS

| Exhibit[1] | Description |
|---|---|
| A | U.S. Patent No. 7,697,508 ("508 patent") |
| B | U.S. Patent No. 8,213,417 ("417 patent") |
| C | Declaration of James A. Proctor, Jr. |
| D | Excerpts from the File History of the 417 patent |
| E | Response to Office Action dated April 6, 2009 from the File History of the 508 patent |
| F | Office Action dated Jan. 6, 2009 from the File History of the 508 patent |
| G | U.S. Patent Publ. 2003/0016655 A1 ("Gwon") |
| H | Final Rejection dated Aug. 13, 2008 from the File History of the 508 patent |
| I | Slides from Defendants' Technology Tutorial |
| J | Excerpts from the Deposition Transcript of Thomas L. Blackburn dated May 18, 2018 |
| K | Excerpts from Internet Engineering Task Force, Request For Comment 3775 (2004), "Mobility Support in IPv6" (Exhibit 5 of the Deposition of Thomas L. Blackburn) |
| L | "A Comparison Between Mobile IPv4 and Mobile IPv6," May 25, 2000, by Sami Kivisaari (Exhibit 6 of the Deposition of Thomas L. Blackburn) |
| M | Excerpts from the Ph.D Dissertation of Dr. Hernandez (Exhibit 32 of the Deposition of Edwin A. Hernandez-Mondragon) |
| N | Excerpts from the Deposition Transcript of Abdelsalam A. Helal dated May 9, 2018 |
| O | Excerpts from the Deposition Transcript of James A. Proctor dated May 17, 2018 |
| P | Excerpts from the Deposition Transcript of Edwin A. Hernandez-Mondragon dated May 10, 2018 |
| Q | Definition of "Replica," Academic Press Dictionary of Science and Technology (1992) |
| R | Definition of "Replica," Oxford Dictionary and Thesaurus (2003) |
| S | Definition of "Replica," The Oxford American College Dictionary (2002) |
| T | Internet Engineering Task Force, Request For Comment 2002 (1996), "IP Mobility Support" (Exhibit 4 of the Deposition of Thomas L. Blackburn) |
| U | Excerpts from the Ph.D. Dissertation Defense of Dr. Hernandez (Exhibit 6 of the Deposition of Edwin A. Hernandez-Mondragon) |

---

[1] The exhibits referenced herein are attached to the Declaration of Michael J. Newton in Support of Defendants' Responsive Claim Construction Brief, which has been filed concurrently.

# I.     INTRODUCTION

U.S. Patent No. 7,697,508 ("508 patent") and its continuation, U.S. Patent No. 8,213,417 ("417 patent") (collectively, "patents-in-suit"), provide a specific solution to a specific problem in "conventional systems." Ex. A at 2:19-37. Specifically, as a mobile node (*e.g.*, a mobile phone) moves from the coverage area of one foreign agent to another, the delay and information loss associated with setting up a new communication link with the new foreign agent can rival the time the mobile node dwells within a given foreign agent's coverage area. *Id.* This could happen, presumably, if a mobile node was on a train that was moving very fast. According to the patents-in-suit, in "conventional systems," the setting up procedures could not begin until the mobile node arrived in the predefined region of coverage of the foreign agent. Thus, time spent setting up the connection shortened the time in which actual data could be exchanged while a mobile node was within the coverage region of the foreign agent. *See also* Ex I at 30-31.

The patents solve this latency by using "ghost" entities to make handoff predictive, as opposed to reactive. The "ghost" entities perform the registration process on behalf of the mobile node ***before*** it arrives in the coverage region of the foreign agent. Using this "pre-registration" process, significantly more of the time that the mobile node is within the coverage area of a foreign agent (dwell time) can be used for the actual exchange of data. To make the pre-registration process work, the proposed solution: (1) predicts the future location of the mobile node; (2) identifies the foreign agent with a coverage area that includes the predicted future location; and (3) uses ghost entities to implement a registration process to the next foreign agent that otherwise required the mobile node to be within the coverage area of the next foreign agent. *See id*. at 32-40.

# II.     TECHNOLOGY BACKGROUND

The patents-in-suit were obtained when cellular networks were already conducting reactive handovers. As discussed above, the alleged novelty of the asserted patents was to make the

registration predictive, using "ghost" entities to predict location and pre-register the mobile node. The following is a discussion of the state of the art at the time the patents were filed. Support and additional background information can be found in Defendants' Technology Tutorial and Expert Declaration of James Proctor. Ex. I; Ex. C at ¶¶ 24-42.

### A.    IP Routing and Mobile IPv4

A standard called "Mobile IPv4" was in existence when the asserted patents were filed, which provided a mechanism for mobility for the Internet Protocol (IP). The IP protocol partitions data into packets that are individually routed through one or more networks using IP addresses. In one aspect, IP addresses are used to determine if the recipient is on a local or remote network. Most, if not all, of the exemplary embodiments of the patents-in-suit focus on the Mobile Internet Protocol (Mobile IP). As of the July 2003 effective filing date of the patents-in-suit, Mobile IPv4 was the current version of the Mobile IP specification. Mobile IPv4 operates by setting up the analog of a mail forwarding system. A specialized router on a mobile node's home network serves as the mobile node's "home agent." When a mobile node is in a foreign network, the router therein serves as the "foreign agent." The home agent receives datagrams destined for the mobile node's home IP address and forwards them to the mobile node's current location by sending them to the foreign agent using a "care-of address." The home agent and foreign agent are also responsible for various communication and setup activities that are required for Mobile IPv4 to work.

As the patents-in-suit acknowledge, the Mobile IPv4 architecture had its disadvantages. Ex. A, 1:59-60. Specifically, Mobile IPv4 was designed to handle mobility of devices, but only relatively infrequent mobility. Ex. T at 4-5. This is due to the overhead, delay, and information losses involved with connecting to a new network, which is acceptable when moving a computer once a week, a day or even an hour, but it can be an issue for "real-time" mobility such as handing over from one wireless access point to another while in a fast moving vehicle. Another drawback

2

to Mobile IPv4 was that all packets sent by a correspondent node had to be routed first to the mobile node's home network, where the home agent then tunneled the packets to the foreign agent on the foreign network where the mobile node was currently connected. This "triangle routing" entailed substantial delay in delivering data and also placed a heavy load on the home agent. At the time the provisional application was filed in July 2003, an assortment of proposals for enhancing the capabilities of the Mobile IPv4 protocol had been made. Ex. A at 1:60-62. The patents-in-suit discuss using a hierarchy of foreign agents. *Id.* at Fig. 1, 1:62-2:18. Another proposal was the Mobile IPv6 protocol, which eliminated the need for foreign agents and permitted direct routing of packets. Ex. C at ¶¶ 34-35.

### B.     Conventional Digital Cellular Networks

By July 2003, numerous 2G, 2.5G and 3G cellular networks had been standardized and implemented throughout the world, including GSM (2G), GPRS (2.5G), CDMA (2G and 3G), and UMTS (3G) cellular networks. The coverage of a typical base station in conventional cellular networks was relatively large (approximately 1.5 km in diameter or more) compared to the coverage area of a typical Wi-Fi access point (on the order of 100 m outdoors and 20 m indoors). Moreover, the time to complete a handover from one base station to another in the same cellular network was 200 ms (milliseconds) or less. Thus, within a particular cellular network, the setting up time (or handover time) was much smaller than the typical dwell time in a cell, even for fast moving vehicles. For example, even at 200 km/h (~124 mph), the dwell time in a 1.5 km cell would be 27 seconds. Notably, handovers in conventional cellular networks did not require the mobile node to change its IP address, unlike in Mobile IPv4.

Because the handover times were small, there were no issues in conventional cellular systems when registering a mobile node to a new base station and resources were allocated reactively. That is, a mobile node took actual measurements of the signals it directly received from

the base stations in the current and neighboring cells and reported the measurements to the cellular network. Thereafter, the cellular network equipment made a handover decision and initiated a handover on behalf of the mobile node based in part on "reacting" to such measurements. These systems did not predict a future location of the mobile node and did not (and could not) pre-register a mobile node to a neighboring cell when the mobile node was outside the coverage area of the cell.

In a typical cellular handover procedure, the mobile node would determine whether the received signals within the current and neighboring cells were strong enough to maintain a call or data connection, and whether any neighboring cell's signal was stronger than the current cell's signal by a specified amount. It could do this because cell coverages overlapped. Thus, the mobile node would be perceiving the coverage from each cell with a different signal strength. If a neighboring cell signal was strong enough to make a connection and sufficiently better than the current cell signal, a handover would take place assuming there was capacity on the new cell to handle the new connection.

## III.    APPLICABLE LEGAL PRINCIPLES

Plaintiff's brief provides a detailed recitation of general legal principles relevant to claim construction. Rather than provide a repetitive recitation of the law, Defendants will reference additional or contrary case law, as appropriate and applicable, in discussing specific terms below.

## IV.    DISPUTED CLAIM TERMS

Plaintiff contends that Defendants want to rewrite the entirety of claim 7 of the 417 patent. Defendants are not to blame for the overt ambiguities afflicting claim 7. Notably, claim 7 should have never been issued. It was withdrawn from consideration in a Response to Restriction Requirement dated May 13, 2011 (Ex. D at 1-7), was never examined by the Examiner in any subsequent office action (*id.* at 8-16, 17-22, 23-27), and was mistakenly included in the list of

allowed claims in the Notice of Allowance. *Id.* at 28-33. Defendants address the claim terms in the order presented by Plaintiff.

      A.      **"ghost mobile node" (508: cls. 1 and 2; 417; cls. 1, 4, and 7)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| virtual node that can act on behalf of the mobile node including software instructions running on a device | a node operating on behalf of the mobile node that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the coverage area of the foreign agent |

The parties agree that the term "ghost mobile node" is ambiguous and requires construction, yet Plaintiff's proposal describes a generic node that could apply to any and every node on a network. It ignores what is described in the four corners of the patents-in-suit. T-Mobile's definition comes directly from statements the applicants had to make during prosecution to gain allowance of the claimed subject matter. Ex. C at ¶¶ 43-53. That is, the ghost mobile node must be capable of performing registration and resource allocation procedures for a mobile node *before* the node arrives in the coverage area of the foreign agent. . Plaintiff's definition also imports a "virtual node" limitation into the claims when the specification discloses that the ghost mobile node can be either remotely located (virtually) or co-located with the mobile node. Ex. A at 6:19-26.

The specification repeatedly emphasizes that the purpose of introducing the ghost mobile node was to register and allocate resources for the mobile node when the mobile node could not do so on its own because it was not in the "range of a next foreign agent" and, therefore, could not receive signals from the next foreign agent. For example, 508: 9:57–10:16 provides:

> The signal from the ghost-mobile node 220 results in a preemptive setup, one that is effected before the mobile node 250 arrives in the predefined area of coverage of the next foreign agent. The setup can entail all the aspects that occur in the beginning phase of a standard network connection negotiation …. These are needed to allow the connection to proceed correctly and reliably, but absent the participation of the ghost-mobile node 220 would have to await the arrival of the

mobile node 250 in the predefined region covered by the foreign agent 215, 230. … The ghost-mobile node 220 can replicate the registration request, handle the creation of tunnels, and replicate authentication and authorization information from the mobile node 250, thus acting on behalf of the mobile node 250 before the mobile node is in range of a next foreign agent 215, 230. … When the mobile node 250 leaves one foreign agent 215 and moves into the vicinity of the next foreign agent 230, registration will have already taken place and resources will already have been allocated for connecting the mobile node to the communication network.

*See also* Ex. A at 2:55-67, 3:60-66, 4:8-18 ("…the ghost mobile node…can cause network communication resources to be allocated preemptively rather than passively as in conventional communications networks in which handoffs typically only follow an exchange of setup information following a mobile node's arrival in the physical region covered by the foreign agent…"), 6:15-38.

These statements in the specification do not stand alone. During the prosecution, the applicants clearly and unambiguously distinguished the ghost mobile nodes and mobile nodes of the "present invention" to overcome a rejection based on the Gwon reference, thereby defining the term "ghost mobile node" as having particular capabilities:

Applicants emphasize the distinction between ghost mobile nodes and mobile nodes of the present invention. The Examiner rejected the ghost mobile node, regardless of its physical embodiment, since it is "a virtual node or a set of software instructions running on the mobile node itself." The fact that the ghost mobile node could be a virtual node is not relevant to the operative role of the ghost mobile node as opposed to the mobile node. An estimated location of the mobile node based on GPS data can be utilized along with trajectory and speed information of the mobile node *to predict the future geographical state*. Based on a predicted future state, one or more ghost mobile nodes can be created that are capable of representing the mobile node, and fulfilling actions traditionally requiring the physical presence of the mobile node, namely registering and allocating communication resources. The ghost mobile node is capable of registering and allocating communication resources *before* the mobile node physically arrives in a geographical state.

Ex. E at 12 (emphasis in original). The file history statements set forth above describe the "present invention" and are not limited to any particular pending claim, such as pending claim 17 as Plaintiff suggests. In fact, Plaintiff left out important words in its opening brief when it claimed that the

"*present invention* . . . refers to" the language of then pending claim 17. Dkt. 31 at 11. The full quote is "the present invention, *as amended in the independent claims*, refers to," which leaves no doubt that the present invention is what is defined in the each of the amended independent claims, including asserted independent claim 1. Ex. E at 11 (emphasis added). The fact that the rest of the language is from application claim 17 does not change this conclusion because claim 17 is simply a method claim that has method limitations paralleling the apparatus claim limitations of claim 1. Therefore, the invention defining statements apply to more than claim 17.[2]

If, hypothetically, these statements do not apply to claim 1 and Plaintiff's definition were adopted, then the alleged invention of claim 1 cannot be distinguished from Gwon. In the Jan. 6, 2009 Office Action, preceding the applicants' distinguishing statements quoted above, the Examiner concluded that Gwon disclosed a ghost mobile node in the mobility prediction analysis, and further that the ghost mobile node could be performed on remote from the mobile node "in the processor facilities and stored programming of the mobile node's local agent 145." Ex. F at 4, 6. The Examiner also concluded that Gwon disclosed the claimed ghost-foreign agent. *Id.*

Looking at Gwon in more detail, Gwon discloses a mobile node that receives Layer 3 beacon signals from base stations and a mobility prediction analysis periodically performed in the mobile node *or in the local agent* (*i.e.*, foreign agent). Ex. G at ¶¶ 59-61; *see also id.* at Figs. 4 & 5, ¶¶ 74-76.[3] The prediction analysis is used to predict the next foreign agent to which the mobile node may connect in the network sufficiently before hand-off is needed. *Id.* at ¶¶ 27, 74; *see also*

---

[2] *See, e.g.*, *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1270 (Fed. Cir. 2007) ("The inventor makes clear that this attribute of the invention is important in distinguishing the invention over the prior art."); *VStream Techs., LLC v. PLR Holdings, LLC*, No. 6:15-cv-974, 2016 WL 5387777, at *6 (E.D. Tex. Sept. 27, 2016) ("It is a common precept of patent law that references to something in the specification as 'the present invention' may limit the scope of the patent claims.").

[3] The Examiner's discussion of Gwon in the Final Rejection dated August 1, 2008, is also useful for explaining how the Examiner understood the teachings of Gwon. Ex. H at 2-3.

*id.* at ¶¶ 61-73 (describing the prediction analysis algorithm). Gwon further discloses that the "mobility prediction analysis 710 may be used to trigger pre-hand-off processing of authentication and security measures, or to trigger advance handling of some aspects of the hand-off process itself." *Id.* at ¶ 60. Accordingly, Gwon teaches the first two elements of claim 1, namely: (1) a mobile node communicatively linked to the wireless communications network, wherein the mobile node has a corresponding geographical current state and one or more predicted geographical future states; and (2) at least one foreign agent identified for each of the geographical future states.

Gwon also describes the process through which the mobile node determines that it is going to lose connection with its current foreign agent and identifies new foreign agents to replace the link with the current foreign agent using the prediction analysis. *Id.* at ¶¶ 46-49, 61-73. The mobile node then checks whether service is available from the next foreign agent(s) by, for example, intercepting Advertisement Messages broadcasted by the next foreign agent(s) or by eliciting the same by sending Agent Solicitation Messages. *Id.* at ¶¶ 75-76. Once the mobile node has obtained such information, it undertakes a pre-registration process in which the mobile node prepares and sends a Registration Request to the next foreign agent. *Id.* However, if a communication channel is not yet established with the next foreign agent, Gwon teaches that the current foreign agent sends the Registration Request to the next foreign agent on the mobile node's behalf. *Id.* In other words, the current foreign agent can: (1) announce its own presence to the next foreign agent (by sending a Registration Request) and (2) announce to the mobile node the presence of the next foreign agent(s) using the procedures discussed in paragraphs 47 to 49. Therefore, under Plaintiff's proposed constructions, Gwon discloses: (a) "at least one ghost mobile node associated with the mobile node, wherein the ghost mobile node can announce to said foreign agent the presence of said ghost mobile node"; and (b) "a ghost-foreign agent associated with said foreign agent, wherein

said ghost foreign agent can announce to said mobile node or said ghost mobile node associated with the mobile node, the presence of said ghost foreign agent."

Gwon also discloses a "means for registering" the mobile node to the next foreign agent (directly or via the current foreign agent) while the mobile node remains in the geographical current state. *Id.* at ¶¶ 77-79. Finally, Gwon discloses a "means for linking the mobile node with a foreign agent … when the mobile node enters a respective geographical future state." *Id.* at ¶ 83. In particular, when the mobile node receives the Binding Update Acknowledgment signal, the mobile node switches or hands-off its communication link from the current foreign agent to the next foreign agent. *Id.* at ¶¶ 81, 83.[4]

In view of these disclosures, under Plaintiff's proposed construction of ghost mobile node (and other terms), there is no difference between Gwon and claim 1. To overcome the Examiner's repeated rejections of claim 1 in view of Gwon, the patent applicants needed to distinguish Gwon in the manner set forth in the file history, namely, by clearly and unequivocally stating that the ghost mobile node is capable of registering and allocating resources at a time when the mobile node is outside the range or coverage area of the foreign agent (*i.e.*, when the mobile node cannot receive Advertisement Messages from the foreign agent). In contrast, the Gwon pre-registration process can only occur when the mobile node can communicate "directly" with the predicted next foreign agents by, for example, receiving Advertisement Messages. *Id.* at ¶¶ 74-76; *see also* Ex. E at 11 ("the new local router can respond 'directly to the mobile node' with a router advertisement message.").

Plaintiff's opening brief alleges that the claims of the 508 patent "are patentable over Gwon

---

[4] To be sure, Defendants maintain that the terms "means for registering" and "means for linking" are indefinite for lack of an adequate disclosure of a corresponding structure for the reasons stated in Sections IV.M and N *infra*. That Gwon discloses these limitations based on the corresponding functions is not a concession to the contrary.

9

because they provide for ghost mobile nodes that are capable of predicting geographical future states, in accordance with the solution to the described problem." Dkt. 33 at 14. As discussed above, this is not a meaningful distinction because Gwon disclosed a ghost mobile node (mobility prediction analysis software running on the mobile node or its local agent) that was capable of predicting the next foreign agent to which the mobile node should connect. Accordingly, the patent applicants' invention defining statements regarding the claimed "ghost mobile node" should be given binding effect in this case because they were necessary to distinguish the prior art. *See, e.g.*, *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 997 (Fed. Cir. 2006) (finding prosecution history disclaimer when patentee distinguished "the present invention" over the prior art).

Plaintiff also claims that even if the file history statements apply to claim 1, Defendants have misinterpreted them to mean that ghost mobile node "directly performs the act of registering and allocating," and that Defendants' construction subsumes other elements or asserted claims because (1) the "means for registering …" in claim 1 performs the registration function and (2) the wireless network in claim 3 provides the allocating of resources functionality. *Id*. at 10-12. Plaintiff is mistaken. Defendants' construction seeks to clarify as to ***when*** the registration and allocation of resources between the foreign agent and ghost mobile node (acting on the mobile node's behalf) occur. It does not impose that the ghost mobile node ***by itself*** performs the registration and allocation of resource functions. Indeed, the registration process described in the specification involves an algorithmic procedure in which the ghost mobile node sends a spoofed registration request signal to the next foreign agent and thereafter works with the next foreign agent to implement a preemptive registration process, which can entail all the aspects that occur in the beginning phase of a standard network connection negotiation, including the negotiation of protocol details, communication rates, and error-handling approaches. *See* Ex. A at 9:6-10:16. The

means for registering is, then, the protocol or algorithm through which a registration occurs. The ghost mobile node is involved in the registration protocol by, for example, replicating the registration request, handling the creation of tunnels, and replicating authentication and authorization information. *Id.* at 10:4-9. Likewise, with respect to allocating resources, the wireless network of claim 3 can make the resources available, but cannot allocate any resources without the ghost mobile node handling the signaling required to allocate the resources that the mobile node needs. Ex. B, claim 1 ("the ghost mobile node handling signaling required to allocate resources"). Like apparatus claim 3, method claim 16 also indicates that the registration process involving the ghost mobile node causes the network to allocate resources. *Id.* at 9:10-20 ("The signal from the ghost-mobile node 220 can cause an allocation of communications network resources…"). Thus, the ghost mobile node is involved in process of registering and allocating resources before the mobile node arrives in the coverage area of the next foreign agent.

Plaintiff further incorrectly claims that the ghost mobile node merely had to be capable of fulfilling ***some*** actions traditionally requiring the physical presence of the mobile node itself. This is not accurate. The file history twice identifies in explicit and unambiguous language what traditional actions need to be performed by the ghost mobile node, "namely, registering and allocating resources." Ex. E at 12. Claim 1's requirement that the ghost mobile node announce its presence to the foreign agent does not require the ghost mobile node's participation in the process of registration and allocation of resources before the mobile arrives in the next foreign agent's coverage area.

Plaintiff also claims that there are distinct embodiments of the ghost mobile node in claims 1 and 17. While there may be some aspects of the ghost mobile node that differ between claims, such as whether the prediction of a future geographical state is made using GPS or some other

location prediction technique (*see* Ex. A at 8:55-60), all claimed embodiments of the ghost mobile

node require that it be capable of registering and allocating resources before the mobile arrives in

the next foreign agent's coverage area in view of the patentee's statements during prosecution.

Finally, Plaintiff incorrectly claims that "none of [the prosecution history] distinctions is

the fact that the ghost mobile nodes register and allocate resources." Dkt. 33 at 14. In making this

argument, Plaintiff focuses on a single paragraph from page 13 of the Office Action Response,

rather than reading this paragraph together with the preceding paragraph, which explicitly states:

> Based on a predicted future state, one or more ghost mobile nodes can be created
> that are capable of representing the mobile node, and fulfilling actions traditionally
> requiring the physical presence of the mobile node, namely registering and
> allocating communication resources. The ghost mobile node is capable of
> registering and allocating communication resources ***before*** the mobile node
> physically arrives in a geographical state.

Ex. E at 12 (emphasis in original). When the two paragraphs are read together, the only reasonable

conclusion is that Gwon does not teach a "ghost mobile node," per Defendants' construction. If

Plaintiff's proposed construction prevails, it will be recapturing claim scope it had to give up to

gain allowance.

**B.      "foreign agent" (508: cls. 1 and 5; 417: cls. 1, 4, and 7)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| a general purpose computer including specialized routing software for relaying communication transmissions | a network node on a visited network that assists the mobile node in receiving communications delivered to a care-of address |

The dispute is about whether or not a foreign agent is a term of art that describes a particular

type of router or routing software capability provided for in the Mobile IPv4 specification.

Defendants' construction is consistent with what the term means to a person of ordinary skill in

the art, whereas Plaintiff's definition encompasses any general computing device that performs a

routing function. Ex. C at ¶¶ 54-59. Plaintiff cites to 508: 4:45-49, which merely describes the

generic hardware and software used to implement a "foreign agent." For example, Plaintiff's

proposal excludes other possible hardware implementations, such as routers disclosed in the

patents. More importantly, it fails to recognize "foreign agent" as a term of art used in Mobile

IPv4, having a specific meaning to a person of ordinary skill and not encompassing every routing

device as Plaintiff's proposal suggests. The specification is replete with references to Mobile IPv4,

and it is clear that the inventors sought to improve upon Mobile IPv4. For example:

> What is generally needed for such architectures to function adequately is some way
> for the mobile node to let other nodes know where the mobile node can be reached
> while the host is moving or located away from home. In accordance with a typical
> mobile networking protocol, a mobile node registers with a home agent so that the
> home agent can remain a contact point for other nodes that wish to exchange
> messages or otherwise communicate with the mobile node as it moves from one
> location to another. ***An example of such a protocol is Mobile Internet Protocol
> (Mobile IP). Mobile IP allows a mobile node to use two IP addresses, one being
> a fixed home address and the other being a care-of address.*** The care-of address
> changes as the mobile node moves between networks thereby changing its point of
> attachment to a network. When the mobile node links to a network other than one
> in which the home agent resides, the mobile node is said to have linked to a foreign
> network. ***The home network provides the mobile node with an IP address and
> once the node moves to a foreign network and establishes a point of attachment,
> the mobile node receives a care-of address assigned by the foreign network.***
>
> ***Mobile IP v. 4 depends on the interaction between a home agent and foreign
> agents***, the foreign agents serving as wireless access points distributed throughout
> a coverage area of a network or an interconnection of multiple networks.

Ex. A at 1:35-59 (emphasis added). The specification further describes what the foreign

agent's routing software and/or router does:

> The foreign agents 210, 215, 230 exist foreign networks in so far as they are part
> of networks to which the mobile node 250 is communicatively linked when the
> mobile node 250 is not linked directly with its home network. Even when the
> mobile node 250 is not directly linked with its home network, though, it can receive
> communications. These communications are typically in the form of datagrams
> having an appropriate care-of address, as will be readily understood by those of
> ordinary skill in the art. ***Accordingly, the foreign agents 210, 215, 230 assist the
> mobile node 250 in receiving datagrams delivered to the care-of address***.

*Id*. at 5:28-38 (emphasis added); *see also id.* at 11:28-40. Therefore, consistent with T-Mobile's

proposed definition, a person of ordinary skill in the art would understand that a foreign agent: (1)

is a network node on a visited network (*i.e.*, foreign network), and (2) assists a mobile node in receiving communications delivered to a care-of-address.  Ex. C at ¶ 59.

By contrast, Plaintiff's proposal is ambiguously broad and conflicts with the industry-established meaning of "foreign agent." For example, claim 1 of the 417 patent requires both a "home agent" and a "foreign agent," yet Plaintiff's proposal encompasses both. Further, in his deposition, Plaintiff's expert Mr. Blackburn was asked questions about the use of the term "foreign agent" by persons of ordinary skill in the art. In particular, Mr. Blackburn was asked with reference to the Mobile IPv6 standard in a section titled "Comparison with Mobile IP for IPv4" why it stated that "[t]here is no need to deploy special routers as 'foreign agents', as in Mobile IPv4. Mobile IPv6 operates in any location without any special support required from the local router." Ex. K at 7; Ex. J at 48:1–49:11. Mr. Blackburn was further questioned about whether Plaintiff's proposed definition encompassed all routers, and if so, why the Mobile IPv6 protocol claimed that the local routers were not "foreign agents." Ex. J at 52:12–56:19; *see also* Ex. L at 5-6, 14 ("However, the mobile IPv6 does not involve foreign agents as mobile IPv4"). While Mr. Blackburn agreed that Plaintiff's construction would encompass any router, he was not in a position to explain why Mobile IPv6, which used local routers on foreign networks, no longer needed special routers known as foreign agents. *Id.*

In a similar vein, the Gwon reference provides exemplary embodiments using Mobile IP version 4 and a draft version of Mobile IP version 6. Ex. G at ¶¶ 36, 39. In describing an embodiment using Mobile IPv6 with reference to Figure 2, Gwon provides:

> It is worth noting that because this example involves a network implementing Mobile IP version 6, the home area (HA) and local routers (R1 and R2) are not referred to as home and foreign agents as in Mobile IP version 4. The detailed reasons for this are given in the Mobile IP version 6 draft IETF document and IETF RFC 2002, both of which have been previously identified and incorporated herein by reference.

*Id.* at 46. Thus, the extrinsic evidence further supports T-Mobile's construction and recognizes that **not** all general purpose computers with specialized routing software are foreign agents as Plaintiff's definition suggests. Instead, consistent with its use in the specification and its meaning in the art, foreign agents are network nodes on visited networks that assist a mobile node in receiving communications delivered to a care-of address.

Finally, Plaintiff argues that because Figure 4 shows an embodiment that the uses "Zero" care-of addresses, Defendants' construction must be incorrect. This argument is based on a complete misunderstanding of what Figure 4 depicts. Figure 4 describes a packet that lists the care-of addresses of all foreign agents within a threshold distance k*r of a particular foreign agent, where "r" denotes that foreign agent's coverage. Ex. A at 11:19-31, 12:1-12. If no foreign agents are within the threshold, then there would be "Zero" care of addresses. Thus, this embodiment has nothing to do with whether foreign agents assist a mobile node in receiving communications delivered to a care-of address.

### C.    "ghost-foreign agent" (508: cls. 1 and 5; 417: cls. 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| a virtual computer including specialized routing software for relaying communication transmissions, acting on behalf of a foreign agent | A virtual node corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network before the mobile node actually arrives in the physical region covered by the foreign agent |

The dispute is about whether the "ghost-foreign agent" is merely a virtual routing device acting on behalf of a foreign agent as Plaintiff proposes (arguably, a generic description of any node), or whether the "ghost-foreign agent" provides an advance notification as proposed by Defendants. Like "ghost mobile node," the term "ghost foreign agent" is ambiguous on its face. Plaintiff again cites to 508: 4:45-49, which simply describes the generic hardware and software used to implement a "foreign agent"—notably not a "ghost-foreign agent." Plaintiff's construction

15

fails to acknowledge that the purpose of the ghost foreign agent in the alleged invention is to make a mobile node aware of a corresponding foreign agent's presence in a communication network before the mobile node actually arrives in the physical region covered by the foreign agent. Ex. C at ¶¶ 60-62. The Summary of the Invention describes the "ghost-foreign agent" as "configured to provide an advance notification to the mobile node of a presence of a next wireless network node proximate to the predicted future location of the mobile node." *Id.* at 3:3-5. The specification similarly provides that:

> ***The ghost-foreign agent can thus make a mobile node aware of a corresponding foreign agent's presence in the communication network before the mobile node actually arrives in the physical region covered by the foreign agent*. <u>*Id.*, 4:3-7.</u>** Referring still to FIGS. 2A and 2B, each of the network node pairs 204a, 204b further includes ghost-foreign agents 225, 240 in addition to network nodes defining foreign agents 215, 230. A ghost-foreign agent 225, 240 transmits an advertisement notifying the mobile node 250 of the existence of a next foreign agent 230, transmitting the advertisement from a foreign agent 215 currently connected with the mobile node 250. That is, the ghost-foreign agent 225 advertises a first foreign agent 230 but does so using a second foreign agent 215. Thus, the advertisement of foreign agent 230 by its ghost-foreign agent 225 is able to reach the mobile node 250 while the mobile node is in the predefined region covered by foreign agent 215. ***Therefore, the ghost-foreign agent 225 makes the mobile node aware of the foreign agent 230 before it arrives in the predefined region covered by the foreign agent. <u>Id.</u>* <u>at 10:17-32.</u>**

Plaintiff's construction also injects unnecessary ambiguity, since it is unclear what constitutes "acting on behalf of a foreign agent." Arguably, any intermediate network node acts on behalf of a foreign agent by, for example, relaying messages to and from the foreign agent.

### D.    "geographical current state" (508: cl. 1)

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| region served by a base station, in which the mobile is linked to the wireless network | coverage area of an agent through which the mobile node linked to the network at its current location |

Plaintiff's construction was first proposed in its Opening Brief.[5] Under Plaintiff's revised construction, there does appear to be a meaningful dispute as Defendants contend that the terms "regions served by" and "coverage area of" (and similar coverage or covered-related terms) mean the same thing and refer to an area where a mobile node can detect advertisement messages (or beacon signals) from the foreign agent.

To the extent Plaintiff contends that "geographical states" cannot overlap, Plaintiff is mistaken. In conventional systems, the regions served by (or coverage area of) different base stations or foreign agents (or home agents) typically overlap. Ex. C at ¶ 64.[6] The "regions" and "coverage areas" are not limited only to those areas where the mobile node is already registered because handoffs typically only follow an exchange of set up information following a mobile node's arrival in the physical region covered by the foreign agent. *See, e.g.*, Ex. A at 4:81-14. This set up information is often exchanged while the mobile node is connected to its current agent/base station, before a connection exists to the next agent/base station, but after a mobile enters the physical region "covered by" or "served by" the foreign agent. Thus, the specification acknowledges that coverage areas overlap and that coverage areas are not defined by the existence of an actual connection to the foreign agent/base station. The specification also uses these phrases interchangeably; the term "region served by" is used four times and the phrases "coverage area of" / "area of coverage" / "coverage region" / "region covered by" are used fourteen times.

Notably, most of these citations use these phrases with reference to a "foreign agent," not a base station. Defendants did not limit their construction to "foreign agents," however, because

---

[5] Plaintiff's original proposal was "region in which it is optimal, based on predetermined thresholds, to communicate with a particular base station." Dkt. 30 at 3.

[6] Dr. Hernandez's Ph.D thesis, which relates to the patents-in-suit, states that "[e]xperimental measurements showed the coverage area of a base station in the simulator was about 506m" and that "the best throughput performance is achieved at a speed of 10m/s and a distance of 500m" between the base stations, thereby indicating that the best results occurred when there was a slight overlap of coverage areas. *See* Ex. M at 41-43.

the current geographical state may be on the home network in which case the coverage area would be of the home agent. The use of the term "base station" also is too limiting because it might be construed to exclude Wi-Fi access points that are not implemented as a base station and runs away from the terminology used throughout the patents in describing the "regions served by" or "coverage areas of." *See* Ex. M at 38. Therefore, Defendants' construction should be adopted.

### E.    "predicted geographical future state(s)" (508, cl. 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| predicted region(s) in which it will be optimal, based upon predetermined thresholds, to communicate with a particular base station | coverage area of a foreign agent in which the mobile node is predicted to be located at a time(s) in the future |

The dispute here is whether Plaintiff should be allowed to import a limitation requiring that the future state be some "optimal" region when such regions are not disclosed in the specification. Defendants' proposal is simply an extension of their proposal for "geographical current state" with respect to a coverage area of (or region served by) a foreign agent and accounts for the manner in which future states are predicted. *See* Ex. C at ¶¶ 66-72.  In contrast, Plaintiff's construction is not tied to the specification, adds uncertainty to the scope of the claim, and fails to account for the prediction of a future location. *See* Ex. J at 158:13-159:20; *see also On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").

Notably, the specification does not use the term "geographical." This term was first introduced in the amended claims of the Office Action Response dated April 6, 2009, discussed above, where the applicants stated:

> An estimated location of the mobile node based on GPS data can be utilized along with trajectory and speed information of the mobile node *to predict the future geographical state*. … The ghost mobile node is capable of registering and allocating communication resources *before* the mobile node physically arrives in a geographical state.

18

Ex. E (emphasis in the original). Nevertheless, the concept of predicting future states is discussed

in various portions of the specification (emphasis added):

> Mobile IP v. 4 depends on the interaction between a home agent and foreign agents,
> the ***foreign agents serving as wireless access points*** distributed throughout a
> coverage area of a network or an interconnection of multiple networks. **Ex. A at
> 1:56-59.** Notably, the ghost-mobile node can be instantiated in at least one
> additional wireless network node proximate to the predicted future location of the
> mobile node. Additionally, ***the ghost-mobile node can be configured to predict the
> future location of the mobile node***. **_Id._ at 2:61-63.** ***The future state can be a
> physical state such as the location of the mobile node 250, and the prediction can
> be the time that the mobile node will be in the predefined region served by the
> foreign agent 215***. Accordingly, the predicted future state of the mobile node 250
> can based, for example, upon the trajectory of the mobile node or upon its speed.
> Alternately, the predicted future state of the mobile node 250 can be based upon an
> estimated location of the mobile node. **_Id._ at 6:39-46.** It be will readily appreciated,
> that other systems for determining location information can be used and that the
> present invention is not limited to embodiments using GPS units. Any of various
> mobile communication techniques employed for mobile telephony can similarly be
> used, for example. ***Alternately, for example, the foreign agents 215, 230 can be
> configured to triangulate the position of the mobile node 250 using signal
> strength*** or through the use of wireless sensors. **_Id._ at 6:58-66.**

*See also id.* at 7:11-8:44 (describing the Kalman filter technique for predicting the mobile node's

future location, which uses current location [x,y], current velocity [$v_x$, $v_y$], and weighting variables

w, to predict a future location), 8:55-60 (identifying other location prediction techniques). The

specification further describes how the predicted future location of the mobile node can be used to

identify the mobile node's next communicative link:

> Based upon the predicted future state of the mobile node 250, the ghost-mobile
> node 220 can determine which foreign agent 210, 215, 230 is likely to serve as the
> mobile node's next communicative link. … Using the updated information, the
> ghost-mobile node 220 can calculate a distance to the closest foreign agent in the
> path of the mobile node 250 based upon an estimated speed or trajectory of the
> mobile node 250. **_Id._ at 8:61-9:5.**

In view of these disclosures, a predicted future state refers to the predicted future location

(in terms of geographic coordinates) of the mobile node. And a predicted "geographical" future

state refers to the coverage area of (or region covered by, region served by, etc.) a foreign agent in

which the mobile node is predicted to be located.

In support of its position, Plaintiff states that the predicted future states can be based on "trajectory, speed, location and signal strength." Dkt. 31 at 18. While these parameters may be used in various techniques to predict a future location, such as triangulation using signal strength, they are not "predetermined thresholds" used to determine what region "will be optimal" for communication. The only determination of something being "optimal" in the specification is the determination of which foreign agent is closest to the predicted future location of the mobile node. *Id.* at 19; Ex. A at 8:45-54. This optimization is based on minimizing a distance, not on any "predetermined threshold."

Plaintiff's position also adds ambiguity about how a person of ordinary skill would determine **when** a region "will be optimal, based upon predetermined thresholds," as evidence by the deposition of Plaintiff's expert. When asked whether the next cell was optimal when a mobile node sends a measurement report indicating that the neighboring cell's signal strength is above a predetermined threshold and/or stronger than the current cell's signal strength by a predetermined amount (another predetermined threshold), Mr. Blackburn could not provide a clear response about **when and whether** that neighboring cell would be "optimal, based on predetermined thresholds" or about how optimality would be determined based on such thresholds. Ex. J at 105:11-21, 106:20-108:10, 111:24-112:7, 123:18-127:9; *see also* Ex. C at ¶¶ 78, 80. Therefore, Plaintiff's proposal should be rejected because it adds ambiguity, and Defendants' construction should be adopted.

> **F.** **"at least one foreign agent identified for each of the geographical future states" (508: cl. 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning (subject to disputed constructions of "foreign agent" | at least one foreign agent whose coverage area is determined to include the mobile node's |

| and "geographical future states") | predicted future location(s) |

Defendants contend "identified for" is a dynamic verb phrase that describes an active step of identification. *TQP Development, LLC v. Intuit Inc.*, No. 2:12-cv-180-WCB, 2014 WL 2810016, at *2 (E.D. Tex. Jun. 20, 2014) ("[T]he phrase "are transmitted," … can be fairly read as a dynamic verb phrase that describes the act of transmission, not a stative phrase that is used adjectivally to describe the data blocks as having been transmitted."). The construction is further supported by the intrinsic record. Ex. A at 8:61-64 ("Based upon the predicted future state of the mobile node 250, the ghost-mobile node 220 can determine which foreign agent 210, 215, 230 is likely to serve as the mobile node's next communicative link."); *see also id.* at 8:44-54, 8:64-9:5. The inventor testimony of Dr. Helal also supports Defendants' construction. Ex. N at 167:9-168:7 (agreeing "there is an active step" of identifying "which foreign agents are identified to be the next … future geographic states").

**G.    "while the mobile node remains in the geographical current state" (508: cl. 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning (subject to undisputed construction of "mobile node" and disputed construction of "geographical current state") | before the mobile node physically arrives in the geographical future state |

For reasons similar to those discussed above concerning the term "ghost mobile node," based on the specification and statements during the prosecution, the "means for registering" (discussed below) must allow a ghost mobile node to register the mobile node to the next foreign agent before the mobile node physically arrives in the geographical future state. Contrary to Plaintiff's statements, Defendants are not conflating the "means for registering" and the "ghost mobile node." Ex. C at ¶ 85. The "means for registering" is a specific process (*i.e.*, algorithm) implemented between the ghost mobile node and the next foreign agent, which allows the mobile node to be "pre-registered" before the mobile node physically arrives in the geographical future

21

state. Both the ghost mobile node and the means for registering must be capable of implementing this pre-registration process for the alleged invention to solve the problem identified in the patents.

### H.    "when the mobile node is located in a geographical area where foreign agent is not physically present" (417: cl. 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning (subject to agreed construction of "mobile node" and disputed construction of "foreign agent") | when the mobile node is located outside of the coverage area of the foreign agent |

Plaintiff's brief does not provide a plain and ordinary meaning of this term is. During his deposition, however, Plaintiff's expert did provide his definition of this term. Ex. J at 210:9-211:5 ("I think the plain and ordinary meaning to that is that there's this area, geographical area where the mobile node is located and the -- the foreign agent is not physically present, so it's not that the -- there isn't a beacon signal or something that's being -- being detected, but the -- basically it's just that the foreign agent is not present in that area, the geographical area.") As discussed above with regard to the term "geographical current state," being outside the geographical area of the foreign agent means the mobile node cannot detect an advertisement signal (or beacon signal) from the foreign agent and therefore cannot initiate direct communications with the foreign agent. Because Plaintiff disputes that Defendants' construction is correct, the Court should construe this term. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351 (Fed. Cir. 2008).

### I.    "a ghost-mobile node that creates replica IP messages on behalf of a mobile node" (417: cl. 1)

| Mobility's Construction | Defendants' Construction |
|---|---|
| a ghost mobile node that creates messages encapsulated in IP packets, that contain the same information transmitted by and on behalf of a mobile node | a ghost mobile node that creates forged IP messages such that the transmission source appears to be an associated mobile node |

Defendants contend that this limitation requires the ghost mobile node to create copies of IP messages that a corresponding mobile node would otherwise send (*e.g.*, an IP registration

message) such that the transmission source appears to be the mobile node. In contrast, Plaintiff contends that simply creating messages in IP form that contain some information transmitted by a mobile node satisfies this limitation. Plaintiff's construction fails to incorporate the plain and ordinary meaning of "replica," for which at least three dictionaries agree means "duplicate" or "exact copy or model." Exs. Q, R, S. "Replica" also appears in claim 2 of the 417 patent, which would inform a person of ordinary skill that the "signaling" in claim 1 "comprises registration with a replica of the mobile node by the ghost mobile node … to maintain routing information to a mobile node."[7] Ex. B at 13:1-5. Therefore, a plain reading of the claim language supports Defendants' construction.

Defendants' construction is also consistent with the specification, which uses the words "spoof," "forge," and "replicate" synonymously with respect to an IP registration message:

> Indeed, the signal from the ghost-mobile node can elicit the same response from the network nodes defining the foreign agents as would be elicited were the mobile node physically present in the predefined region covered by the particular foreign agent. In the context of an IP-based network, the ghost-mobile node can create "***spoofed***" Universal Datagram Packets (UDP) with the contents of a legitimate mobile node packet. ***Id.* at 9:3-20.** In any case, as the ghost-mobile node essentially ***forges*** registration packets on behalf of the mobile node, no time-stamping or nonce numbers need to be used … The signal from the ghost-mobile node results in a preemptive setup … These are needed to allow the connection to proceed correctly and reliably, but absent the participation of the ghost-mobile node would have to await the arrival of the mobile node in the predefined coverage area by the foreign agent. ***Id.* at 9:45-64.** The ghost-mobile node can ***replicate*** the registration request, handle the creation of tunnels, and ***replicate*** authentication and authorization information from the mobile node, thus acting on behalf of the mobile node before the mobile node is in range of a next foreign agent. ***Id.* at 10:1-6.**

Whereas in Mobile IPv4 the mobile node could only send an IP registration message upon arriving

---

[7] Extrapolating from claim 2 does not violate the doctrine of claim differentiation, since there are additional limitations in claim 2 that does not render it superfluous over claim 1. *See, e.g.*, *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1358 (Fed. Cir. 2006) (restricting independent claim to use of "precision index downshifting" even though this term was present in dependent claim, when additional differences existed between the independent and dependent claim); *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("[A] patentee may define the same subject matter with claims having different terminology.").

in the coverage are of the next foreign agent, the 417 patent sought to improve upon Mobile IPv4 by empowering the ghost mobile node to forge and transmit such IP registration message on behalf of the mobile node. *See id.* at 2:10-33, 9:3-20, 9:45-64. In fact, Figure 3 of the 417 patent, which illustrates an IP registration message created by the ghost mobile node is *identical* to the IP registration message sent by a mobile node, as defined in the Mobile IPv4 standard.



| Ex. B at Fig. 3 | Ex. T (RFC 2002) at 27 |

*See also* Ex. B at 11:28-34; Ex. C at ¶ 91; Ex. O at 16:22-17:18, 22:9-40:7.

Plaintiff's construction finds no support in the specification and serves only to add more ambiguity. It is unclear what *type* of information would satisfy this limitation under Plaintiff's construction, as well as *how much* of such information and in what *context* and *to whom* a mobile node would transmit such information. There is no written description support beyond the replication of IP registration, authentication, and authorization messages that a mobile node would normally send in the Mobile IPv4 context. With such an unbounded construction, Plaintiff is free to assert that *any* IP packet created by a ghost mobile node that contains *any bit* of information a mobile node transmits in *any context* at *any time* meets this element. This cannot be. Notably, even Plaintiff's own expert agrees that "replica" means "a copy … whether it's an exact copy, but it's a copy." Ex. J at 206:5-20. The inventors (who are also the Plaintiff) similarly acknowledge that "replica message" is "an exact copy [like] for anyone you never know if it came from you or somebody else" of a "message that the mobile node would otherwise send." *See* Ex. P at 139:7-

11; Ex. N at 186:1-17. Therefore, the Court should adopt Defendant's construction.

**J.        "updating, in a mobile node, a location in a ghost mobile node" (417: cl. 7)**

| Mobility's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning (subject to agreed construction of "mobile node" and disputed construction of "ghost mobile node") | Indefinite/incapable of construction |

The "insolubly ambiguous" indefiniteness standard stated in Plaintiff's brief is obsolete. The correct, less rigid test is whether a claim, "read in light of the specification delineating the patent, and the prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Defendants contend that this phrase does not make sense as written. The claim language and specification confirm that the "plain and ordinary meaning" of this phrase is subject to reasonable debate. Thus, this phrase is indefinite. The Court cannot correct errors in the claim language if "the correction is . . . subject to reasonable debate based on consideration of the claim language and the specification." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003). Here, although the error is obvious, there is a reasonable debate about the appropriate correction because the claim is subject to multiple possible corrections. For example, it is unclear whether "a location" is a current or predicted location of a mobile node. Further, based on conflicting testimony from Plaintiff's own experts,[8] it is unclear whether "a location" refers to geographic coordinates or something else, like a memory location.

Plaintiff claims that the embodiment of the 417 patent at 7:7-10 supports the "plain and ordinary meaning" because it discloses a GPS location updated in both the mobile node and ghost mobile node. Thus, Plaintiff would rewrite the phrase to say "updating the location of a

---

[8] Plaintiff proffers Dr. Helal and Dr. Hernandez as "experts." Notably, they are not only the inventors of the patents-in-suit but are also the owners of Plaintiff itself who have a financial stake in the outcome of this litigation.

mobile node in both the mobile node and the ghost mobile node." Another interpretation of this

phrase, however, which is consistent with the specification and claim language, is that the "ghost

mobile node updates a *predicted* location of the mobile node." *See* Ex. B at 8:39-9:2; Ex. C at

¶ 94. This is reasonable because the next limitation of claim 7 requires the ghost mobile node to

determine a distance to closest foreign agent to which the mobile can complete a handover. To

determine the closest foreign agent, the ghost mobile node must use an updated predicted

location of the mobile node as described in the specification. *Id.* Finally, inconsistencies between

the testimony of co-inventor Dr. Helal and the testimony of Plaintiff's expert Mr. Blackburn

demonstrate the indefiniteness of this limitation. Ex. N at 202:22-203:5 (describing location as

"an address for communicating between the two entities," not a geographical location); Ex. J at

225:25-226:4 (describing location as a geographical location of a device); *see also* Ex. U at 41

("distance(FA, MN) is the *predictive distance*, otherwise it is not predictive but reactive."). As

such, this claim limitation should be held indefinite. *See, e.g.*, *Chef Am., Inc. v. Lamb-Weston,*

*Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[I]n accord with our settled practice we construe the

claim as written, not as the patentees wish they had written it.").

K.    **"submitting on behalf of the mobile node, from the ghost mobile node, a
      registration to the foreign agent to which the mobile node is going to
      complete the handover" (417: cl. 7)**

| Mobility's Construction | Defendants' Construction |
| --- | --- |
| Plain and ordinary meaning (subject to agreed construction of "mobile node") | submitting on behalf of the mobile node, from the ghost mobile node, a registration to the foreign agent while the mobile node is located outside the coverage area of the foreign agent |

Defendants contend that the phrase "is going to complete the handover" is coextensive with

other disputed claims terms, including "ghost mobile node," "while the mobile node remains in

the geographical current state," and "when the mobile node is located in a geographical area where

foreign agent is not physically present," for the same reasons detailed above. *See supra* Sections IV.A, -G, -H. The spirit and crux of the claimed invention is the ghost mobile node's ability to send a registration request on behalf of the mobile node while the mobile node is located outside the coverage area of the foreign agent. *See, e.g.*, Ex. B, 4:9-18, 6:35-38, 9:6-20, 9:57-10:16. Further, the patentee's statements distinguishing the prior art made during the prosecution of the 508 patent apply with "equal force" here with respect to similar claim limitations such as this. *See, e.g.*, *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978–80 (Fed. Cir. 1999).

**L.**   **"upon completing the handover, updating a registration in the mobile node" (417: cl. 7)**

| Mobility's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning (subject to agreed construction of "mobile node") | Indefinite/incapable of construction |

Defendants contend that updating a registration in a mobile node *after* completing the handover makes no sense. Ex. C at ¶ 96. Updating a registration in the mobile node is a part of the handover process, not something that occurs upon completing handover. Plaintiff's citation to 417: 9:7-12 describes a registration request sent to initiate a handover, not *upon completing the handover*. Also, when Dr. Helal was questioned about this limitation, he claimed that the registration needed to occur during the handover in contradiction to the plain and ordinary meaning of the term. Ex. N at 207:5-19. As such, this limitation makes no sense and should be held indefinite. *See Chef Am., Inc.*, 358 F.3d at 1374.

**M.**   **"means for registering said ghost mobile node or mobile node with the associated ghost foreign agent or foreign agent, while the mobile node remains in the geographical current state" (508: cl. 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Structure: a signal received by a computing device having operational software and a transceiver.<br><br>Function: The phrase "while the mobile node remains in the geographical current state" means "while the computing device | Indefinite for lack of adequate disclosure of a corresponding structure |

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| having operational software and a wireless transceiver remains in the region in which it is optimal, based upon predetermined thresholds, to communicate with a particular base station." | |

The parties agree that the "means for registering" limitation is subject to § 112(6), but a dispute remains about whether the specification discloses sufficient structure to perform the recited function and about the meaning of the phrase "while the mobile node remains in the geographical current state." Defendants contend that this claim limitation is indefinite because the specification does not adequately disclose a structure for performing this function, while Plaintiff proposes that the structure is "a signal …" without reference to any algorithm to implement a registration.

One skilled in the art would not consider any signal received by a computing device having operational software and a transceiver to be a means for registering. Ex. C at ¶ 98. At best, a specific type of registration request signal would start a specific registration process, but not result in registering one device to another. The specification only describes a procedure in the context of Mobile IP registration, yet Plaintiff's proposed structure covers every signal that might be used in processes—for registration or otherwise—that are not described in the specification. Means plus function limitations should not be construe to cover every means to perform the function when the patent only discloses a specific structure. *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012). For this reason, Plaintiff's proposal must be rejected.

More problematic here is the alternative language requiring the means for registering to register said ***ghost mobile node <u>or</u> mobile node*** with the associated ***ghost foreign agent <u>or</u> foreign agent.*** Though registration procedures are described in 508: 9:6-67 and 10:37-67, there is no disclosure of a structure or process that registers a ghost mobile node or mobile node to a ghost foreign agent, which comprise two of the four registration permutations required by the plain language of the claim. As discussed above, ghost-foreign agents exist to make mobile nodes aware

of a foreign agent before the mobile node arrives in the predefined region covered by the foreign agent, not as an entity with which the mobile node or ghost mobile node registers. Plaintiff's expert Mr. Blackburn agreed that the purpose of the ghost foreign agent was "to simply announce the presence of the foreign agent at a time when the mobile node couldn't otherwise receive a signal from the foreign agent," and during his deposition, he could not cite to any structure in the patent for registering a ghost mobile node or mobile node to a ghost foreign agent. Ex. J, 181:7-183:12. Neither Mr. Blackburn's supplemental declaration, nor Plaintiff's brief cite to any disclosure of a signal or other protocol registering a ghost mobile node or mobile node to a ghost foreign agent.

In view of this, there is no structure or disclosure in the specification of ghost mobile node or mobile node registering to a ghost-foreign agent. Therefore, this term should be found indefinite for failing to disclose any structure to perform the recited function. *See Media Rights Tech.'s, Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) ("Where there are multiple claimed functions, as there are in this case, the patentee must disclose adequate corresponding structure to perform all of the claimed functions").

**N.     "means for linking the mobile node with a foreign agent associated with said ghost foreign agent when the mobile node enters a respective geographical future state associated with said foreign agent" (508: cl. 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Structure: a transceiver<br><br>Function: "linking the mobile node with a foreign agent associated with said ghost foreign agent when the mobile node enters a respective geographical future state associated with said foreign agent" | Indefinite for failure to adequately disclose and/or link a corresponding structure<br><br>Corresponding Structure (in the alternative): a mobile node, ghost mobile node, foreign agent, and ghost foreign agent executing a process routine and/or software disclosed at 6:28-10:67, Figs. 2A & 2B and equivalents thereof. |

Though the parties agree that this limitation is also governed by § 112(6), Plaintiff's position that a "transceiver" alone can perform the claimed function is clearly mistaken. The

specification must not only "clearly link[] or associate[] that structure to the function recited in the claim," but must also provide "an adequate disclosure showing what is meant by that claim language." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311-12 (Fed. Cir. 2012). The portion of the specification upon which Plaintiff relies only describes the *hardware* used for linking but in no way explains the *process* for linking, particularly "when the mobile node enters a respective geographical future state associated with said foreign agent." Dkt. 33 at 29; Ex. A at 4:60-67, 6:22-26. Indeed, Plaintiff has never been able to articulate an enabling disclosure. The only portion of the specification that appears to be related is 508: 10:55-65 with regard to Figure 2B. However, it is unclear from this disclosure how exactly the ghost mobile node transitions the registration to the mobile node upon the mobile node's arrival into the coverage area of the next foreign agent, particularly when the ghost mobile node does not need to be co-located with the mobile node as Plaintiff contends. *See* Ex. A at 6:15-27.

To the extent the Court determines that there is a structure linked or associated to the recited function, Defendants propose that the corresponding structure is "a mobile node, ghost mobile node, foreign agent, and ghost foreign agent executing a process routine and/or software disclosed at 6:28-10:67, Figs. 2A & 2B and equivalents thereof." At a minimum, all of the processes disclosed—how the ghost mobile node tracks the location of the mobile node and the nearest foreign agents using a Kalman filter "to determine the amount of time before the ghost-mobile node can send a registration message and act on behalf of the mobile node," as well as the registration processes based on Mobile IPv4—must work together to link the mobile node with the foreign agent when entering the coverage area of the foreign agent. *See* Ex. C at ¶¶ 107-108.

## V.    CONCLUSION

For the foregoing reasons, T-Mobile respectfully requests that the Court adopt T-Mobile's proposed constructions and reject Plaintiff's proposed constructions.

Dated: June 20, 2018                    By: */s/ Michael J. Newton*
                                        Michael J. Newton (TX Bar No. 24003844)
                                        Derek S. Neilson (TX Bar No. 24072255)
                                        Sang (Michael) Lee (TX Bar No. 24083378)
                                        ALSTON & BIRD LLP
                                        2828 North Harwood Street, Suite 1800
                                        Dallas, Texas 75201
                                        Phone: (214) 922-3400
                                        Fax:    (214) 922-3899
                                        mike.newton@alston.com
                                        derek.neilson@alston.com
                                        michael.lee@alston.com

                                        Ross R. Barton (NC Bar No. 37179)
                                        ALSTON & BIRD LLP
                                        101 South Tyron Street, Suite 4000
                                        Charlotte, North Carolina, 28280
                                        Phone: (704) 444-1000
                                        Fax:    (704) 444-1111
                                        ross.barton@alston.com

                                        Holly H. Saporito (GA Bar No. 142496)
                                        ALSTON & BIRD LLP
                                        One Atlantic Center
                                        1201 West Peachtree Street, Suite 4900
                                        Atlanta, Georgia 30309
                                        Phone: (404) 881-7000
                                        Fax: (404) 881-7777
                                        holly.saporito@alston.com

                                        Melissa R. Smith (TX Bar No. 24001351)
                                        GILLAM & SMITH, LLP
                                        303 South Washington Avenue
                                        Marshall, TX 75670
                                        Phone: (903) 934-8450
                                        Fax: (903) 934-9257
                                        melissa@gillamsmithlaw.com

                                        *Attorneys for Defendants T-Mobile US, Inc.,*
                                        *T-Mobile USA, Inc., and MetroPCS Texas*
                                        *LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was filed on this 20th day of

June, 2018, using the CM/ECF system which will send notification of such filing to all counsel of

record.

*/s/ Michael J. Newton*
Michael. J. Newton
